IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
MAY 26 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. | ) ) ) | |
| Plaintiff, | ) ) | No. 99 C 3356 |
| vs. | ) ) | Judge Warren K. Urbom |
| THE DIAL CORPORATION, | ) ) | |
| Defendant. | ) ) | |

**DOCKETED**
MAY 27 2004

## NOTICE OF FILING

TO:   Michael A. Warner            John C. Hendrickson
       Seyfarth Shaw                  U.S. Equal Employment Opportunity Commission
       55 East Monroe Street       500 West Madison Street
       Suite 4200                        Suite 2800
       Chicago, IL 60603-5803      Chicago, IL 60661

PLEASE TAKE NOTICE that on May 26, 2004, the undersigned filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, **ONE-YEAR REPORT OF THE CONSENT DECREE MONITORS TO THE PARTIES AND TO THE COURT**, a true and correct copy of which is attached hereto.

Respectfully submitted,

_____
George F. Galland, Jr., One of
the Consent Decree Monitors

George F. Galland, Jr.
14 West Erie Street
Chicago, Illinois 60610
(312) 751-1170

Reginald E. Jones, Esq.
Coudert Brothers, LLP
1627 I Street, NW, 11th Floor
Washington, D.C. 20006

Nancy Kreiter
380 Sheridan Rd.
Winnetka, IL 60093

# ONE-YEAR REPORT OF THE CONSENT DECREE MONITORS TO THE PARTIES AND THE COURT

George F. Galland, Jr.
Reginald E. Jones
Nancy B. Kreiter

FILED
MAY 26 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

We were appointed as Decree Monitors pursuant to the Consent Decree agreed to between the Equal Employment Opportunity Commission and Dial Corporation in case no. 99-C 3356 in the United States District Court for the Northern District of Illinois. This lawsuit alleged a pattern and practice of sexual harassment of employees at Dial's plant in Montgomery, Illinois, near Aurora.

DOCKETED
MAY 27 2004

Paragraph 44 of the Decree provides:

Within two (2) months after the appointment of the Decree Monitors, they will: (i) evaluate all existing employment policies, procedures, and practices that are related to the objectives contained in the Statement of Intolerance of Sexual Harassment and this Decree; and (ii) after consultation with EEOC and Dial, make recommendations for any changes to such existing policies, procedures and practices that the Decree Monitors believe is necessary or appropriate. The Decree Monitors shall report their findings and recommendations to EEOC and Dial.

On August 29, 2003, we issued to Dial and to the EEOC the Two Month Report required by paragraph 44. The present report will refer to findings from that Two Month Report as appropriate.

Paragraph 47 of the Decree provides:

Within one (1) year after appointment, the Decree Monitors shall complete their own review and evaluation of all current employment policies and practices, and shall submit a written report to EEOC, Dial and the Court setting forth the following information:

(i) an assessment of whether Dial has successfully implemented each specific policy/practice agreed upon in paragraph 39 above;

(ii) for each specific policy/practice that has not been successfully implemented, a statement discussing the reason for Dial's failure to implement such change;

439

(iii)   an evaluation of the impact of the specific changes made pursuant to this Decree;

(iv)   an assessment of the effectiveness of Dial's policies and practices for the achievement of Dial's Statement of Intolerance of Sexual Harassment;

(v)   recommendations for any changes to existing practices, policies or programs or any additional policies, practices or programs that the Decree Monitors deem necessary or appropriate for achieving Dial's Statement of Intolerance of Sexual Harassment and the terms of this Decree; and

(vi)   timetables for implementation and completion of compliance with any of the recommendations, subject to the terms of this Decree.

To prepare for this One Year Report, we maintained contact with Dial throughout the year. We asked for and received material on a number of subjects. On March 24, 29, and 30, 2004, we interviewed 75 employees at the Montgomery plant. We randomly selected employees for interview. Those chosen included both hourly and salaried employees; employees on all three shifts; employees from all areas of the plant; both men and women (although, since the lawsuit was brought on behalf of women, we interviewed many more women than men); and supervisors and nonsupervisors. In addition to our random selection of employees, we offered all employees the opportunity to request an interview and we took steps to assure that those who requested it were not identified to Dial management. Five employees requested interviews. We assured all employees that the interviews were confidential. In general, we believe employees spoke candidly and freely to us.

As a result of these activities, we feel confident that we can make valid judgments about the state of Dial's compliance with the Decree and the current situation in the plant.

2

## I. DIAL'S COMPLIANCE WITH SPECIFIC OBLIGATIONS FROM PARAGRAPH 39 OF THE DECREE

### A. Required changes to the formal policy on harassment

The No Harassment or Retaliation Policy that existed as of the date of the Consent Decree was a brief document (attached as Exhibit A) that applied to not only sexual harassment but all forms of EEO-related harassment covered by federal, state, or local law. Paragraph 39(a) of the Consent Decree required Dial to:

> revise its No Harassment Policy, as necessary, in order to: (i) provide examples to supplement the definitions of sexual harassment; (ii) include strong non-retaliation language with examples to supplement the definition of retaliation, and provide for substantial and progressive discipline for incidents of retaliation; (iii) provide that complaints of sexual harassment and/or retaliation will be accepted by Dial in writing and orally; (iv) provide a timetable for reporting sexual harassment and retaliation, for commencing an investigation after a complaint has been made or received and for remedial action, if any, to be taken upon conclusion of an investigation; and (v) indicate that, promptly upon the conclusion of its investigation of a complaint, Dial will communicate to the complaining party the results of the investigation and the remedial actions taken or proposed, if any, so long as the complainant agrees to keep any disciplinary action taken confidential.

These provisions in practice required a rewriting of Dial's previous policy. Pursuant to this provision, Dial submitted to the Monitors a proposed revision. The Monitors suggested certain changes and additions. Agreement was reached, prior to our Two Month Report, on a final version attached as Exhibit B. As can be seen from that Exhibit, the new Policy includes all the specific requirements of paragraph 39(a).

In our Two Month Report, we recommended that Dial immediately distribute the revised policy to all employees in the plant, with a written request to read it and return, within a short number of days to be determined by Dial, a written acknowledgment that they received and read

3

it, and that Dial post the policy in the plant in place of the superseded policy. Dial carried out this recommendation.

**B.  Required Changes To Complaint Procedures**

Paragraph 39(b) of the Decree required Dial to revise its complaint procedure, as necessary, to ensure that it is designed to encourage employees to come forward with complaints about violations of its No Harassment or Retaliation Policy.

The revised No Harassment or Retaliation Policy has carried out Dial's responsibility under 39(b). Specifically:

(1)  As required by ¶39(b)(i), the revised Policy designates two Human Resources Department officials and their telephone numbers as persons who can be contacted. When the plant's Human Resources Director recently retired and was replaced, Dial, without prompting from us, corrected the Policy to change the contact-person names, and redistributed the Policy throughout the plant.

As also required by ¶39(b)(i), Dial has kept its 24 Hour Complaint Hotline in place. We reviewed the written and on-line materials which are available to employees and the manner in which employees can use the system to make a complaint. We also interviewed the responsible individuals within Dial Corporation charged with oversight of the 24-hour hot line system, including the assistant corporate secretary.

The Hotline is a system for receiving complaints from employees throughout the Dial organization. The system is not limited to complaints of sexual harassment. Complaints can be made by the toll free telephone number (the number is prominently posted on a banner in the

4

plant, and in the printed No Harassment or Retaliation Policy), or by filing a complaint online. Dial uses an outside contractor (EthicsPoint) to receive such complaints and transmit them to Dial. In practice, this Hotline has been used by employees across the corporation but has rarely, if ever, been used to report a complaint of sexual harassment.

In the course of reviewing the on-line method of reporting a complaint, the Monitors noticed that employees were required to sign a waiver and disclaimer before filing an on-line complaint. This led us to examine whether such a practice could act as a disincentive to an employee actually making a complaint, and in turn to evaluate Dial's methods to assure confidentiality of complaints made to the Hotline. We are satisfied that safeguards are in place to protect confidentiality of any employee who chooses to use the Hotline, whether by phone or on-line. We asked a number of employees about the Hotline in our interviews and found no evidence of any distrust of this mechanism.

(2) ¶39(b)(ii) requires Dial to assure that complainants will be interviewed about their complaints in such a manner that permits the complaining party, at her or his election, to provide information in a confidential manner. To this end, the revised Policy explicitly guarantees complainants and witnesses "the opportunity to provide information in a confidential manner, such as providing the information outside of their work area."

There has been only one complaint since the Decree took effect that alleged sexual harassment. The investigation was appropriately conducted away from the factory floor, in the office of the investigating Human Resource official, as the Decree requires.

Dial was not required by the Decree to consult with the Complaint Monitor in the course of conducting this investigation, but it elected to do so. Dial found merit to the complaint in

5

question and discharged the accused employee. We reviewed the documentation assembled in the course of the investigation and found that documentation to be thorough and well done. As we will discuss in Section II below, our interviews with employees amply confirmed that nothing compares with termination of an offender for making clear an employer's refusal to tolerate sexual harassment in the workplace.

(3) ¶39(b)(iii) imposes a best-efforts requirement of three weeks to complete investigations of complaints of sexual harassment and retaliation, with another seven days to prepare findings of the result of the investigation and remedial action proposed. Dial easily met this time limit in the one investigation conducted since the Decree (discussed above), completing the investigation and taking action in less than two weeks.

(4) ¶39(b)(iv) requires Dial to allow complainants who are dissatisfied with the disposition of a complaint the opportunity to appeal to the "Complaint Monitor." Dial advised the complainant in the case referred to above of her right to appeal. No appeal was taken, unsurprisingly, since the complaint resulted in a discharge.

(5) During our employee interviews, we looked for any evidence that the present complaint procedure for sexual harassment at the plant deters employees from making complaints if they are experiencing sexual harassment. We found no substantial evidence of such deterrence. We asked employees whether, if they were experiencing sexual harassment, they would report it. Of the women asked this question, 58.8% flatly answered yes; another 35.3% said they would report harassment if they couldn't take care of it themselves or if it were severe enough; only 5.9% said they would not report it, and only two such persons gave distrust of management as their reason.

6

### C. Policies To Promote Supervisor Accountability

(1) Section 39(c)(i) provides:

Dial agrees that it shall impose discipline – up to and including termination, suspension without pay, or demotion – upon any supervisor or manager who engages in sexual harassment or tolerates any such conduct in his or her work area or among employees under his or her supervision, or who retaliates against any person who complains or participates in any investigation or proceeding concerning any such conduct. Dial shall communicate this policy to all of its supervisors and managers.

No accusations of sexual harassment against supervisors or managers have been made since the Decree took effect. The one formal accusation against a nonsupervisory employee raised no issue of a supervisor "tolerating" that employee's activity within the meaning of this paragraph. The policy referred to in this paragraph is clearly included in Dial's revised No Harassment or Retaliation Policy, which, as stated above, has been communicated to all supervisors and managers. Likewise, the on-line training for supervisors (see below) emphasizes that discipline can result from harassment or retaliation by supervisors or managers.

(2) Section 39(b)(ii) requires Dial to continue to advise all managers and supervisors of their duty to monitor their work areas to ensure employees' compliance with the No Harassment or Retaliation Policy, and to report any incidents and/or complaints of sexual harassment and/or retaliation of which they become aware. The revised No Harassment or Retaliation Policy to which Dial has agreed includes language to this effect, as do the on-line training programs that Dial has given (see below). In March 2004, the Director of Human Resources at the plant, in connection with the annual distribution of the No Harassment or Retaliation policy, instructed all managers to conduct training on this policy during a team meeting, with a completion date of April 16, 2004, and required documentation to assure that

7

everybody completed this training and review.

In our interviews with employees, we asked about the activities of their supervisors in bringing up sexual harassment issues during team meetings, which take place every week. We received varying responses about the frequency and length of time that was devoted to these issues by supervisors. It is clear that some supervisors are more careful and thorough than others in making sure that this subject matter gets brought up from time to time during team meetings. We therefore recommend that Human Resources provide ongoing guidance to supervisors to conduct activities in these meetings, at least on a quarterly basis beginning no later than July 1, 2004, that promote awareness of the No Harassment or Retaliation policy and to conduct proactive measures to prevent sexual harassment. To prevent such activities from turning into a rote or perfunctory exercise that never varies in content, Human Resources should become involved in planning the activities that supervisors will be asked to conduct and should take steps to assure that supervisors carry out the activities as planned on a reasonable uniform plantwide basis. We request that the Human Resources Director apprise us of each quarter's guidance to supervisors and provide verification of supervisor compliance.

(3) In ¶39(c)(iii), Dial agreed to "use in its supervisor appraisal process, an evaluation of the supervisor's handling of equal employment opportunity ("EEO") issues, and to link such evaluations directly to supervisor salary/bonus structure." In our Two Month Report, we recommended that Dial revise its current performance evaluation form and related materials in order to assure that the supervisor's handling of equal employment opportunity issues is specifically addressed during the appraisal process. Dial revised the form as requested.

Dial has provided us evidence that in the recent round of evaluations, evaluators are

8

paying attention to the support that supervisors are giving to the Equal Opportunity Policy. There was no evidence during the year under review of inappropriate failure by supervisors to handle complaints or address episodes of sexual harassment. We request that Dial similarly provide us, by the end of the next evaluation cycle, with copies of specific material that comments in any manner on specific supervisors' performance or nonperformance in the area of EEO (names of evaluated employees should be deleted).

  (4) In ¶39(c)(iv), Dial agreed to use "commitment to equal employment opportunity" as a criterion for qualification for supervisory positions. The Decree does not elaborate on this requirement, which raises two issues. The first is: how is this "criterion" applied when Dial promotes someone from a nonsupervisory position into a supervisory position. The second issue is: how is this "criterion" applied when Dial promotes management or supervisory people to higher-level management or supervisory positions? In both situations, the wording of ¶39(c)(iv) seems to assume a formalized promotion process in which formal "criteria" are applied to candidates for promotion, whereas, like many employers, Dial has not formalized to that extent its promotion process for supervisory or higher-level management positions.

  Whatever Dial's techniques for such promotions, ¶39(c)(iv) clearly is intended to require steps to be taken to assure that persons known or suspected to have engaged in sexual harassment or related retaliation do not get promoted into these positions. (This is mainly an issue for promotion of supervisors to higher-level supervisory positions, because in recent years, it has been extremely rare to promote hourly workers into a supervisory salaried position. Dial has affirmed that it fills most entry-level supervisory positions by hiring persons with engineering backgrounds from outside.) ¶39(c)(iv) also clearly requires Dial, in making promotion decisions

9

involving supervisory vacancies, to consider more generally any known history of the candidate relating to EEO matters.

The Human Resources Director participates in all promotions or hirings to management positions. She assures us that her participation is sufficient to guarantee that any persons who are known or suspected to have engaged in sexual harassment, or otherwise have negative experience in the area of EEO, will be flagged in the process and will not be granted the promotion. Given that the plant is not large and such promotions are rare, we see no reason to suggest any more formal process for applying the "criterion" of ¶39(c)(iv).

### D. Sexual harassment prevention training

(1) Under ¶39(d)(i), Dial must continue to provide mandatory sexual harassment prevention training annually to all supervisors at the plant, to provide training to all new employees during employee orientation, to provide training to all "senior management officials," and to all Dial employees who are to be assigned to work at the plant, before their assignment begins.

Dial has gone well beyond the requirements of this paragraph. In particular, the Decree does not specifically require sexual harassment prevention training of all workers at the plant, but in the past year Dial conducted two on-line sexual harassment prevention training courses developed by Seyfarth Shaw At Work, one for nonsupervisory and the other for supervisory and managerial employees. We reviewed both these courses and found them well done. We recommended certain modifications which Dial implemented by dealing with its vendor.

The course, which is marketed to many employers and is adapted for the particular

10

employer's specific policies, uses a theme of classifying behavior in the "red, yellow, or green" zones. This theme registered with employees who took the course. Many employees acknowledged to us that using the phrase "You're in the red" or "You're in the yellow" provides a relatively nonconfrontational way to tell someone that his or her behavior is objectionable and will get him or her in trouble if he continues.

In our interviews, employees' reactions to the on-line format of the training varied. Other things being equal, live training does seem more desirable to us than on-line training (in which the course-taker can't ask questions), and some employees, both supervisory and nonsupervisory, expressed a preference for the live format. However, under present circumstances at Dial, the on-line courses have been more than adequate.

We recommend that the company immediately follow up to assure that on-line training is given to employees who for one reason or another, such as absence or technological barriers, missed the first round, since we came across a handful of people in interviews that did miss the training for such reasons. We request that Dial notify us when all training has been completed.

Dial provided evidence that most employees had previously had some sort of sexual harassment prevention training as part of more general training topics. It was therefore noteworthy that over half the employees we interviewed, including many who had been at Dial for many years, told us that they had never had sexual harassment prevention training at Dial before taking the on-line course. It seems clear that employees participate in a lot of training and that they tend to forget over time about the specific subject matter involved – particularly if (as with sexual harassment prevention training in years past) the subject in question is included with other subjects.

11

We recommend that Dial design a refresher version of sexual harassment prevention training to be given every one to two years. Providing refresher training was supported by the vast majority of the employees we interviewed and seems particularly appropriate given the difficulty many people have in remembering even the fact of prior training in this area. The length and format of such refresher training is left to the company in light of its other training programs and logistics. Strong consideration should be given to including live discussion in such refresher training, since the ability to ask questions is the main missing ingredient from any on-line training format. We request that Dial advise us of plans for such refresher training, as well as the opportunity to review the content. We also request notification of, and the prior opportunity to review, the annual supervisory training in 2004 mandated by ¶39(d)(i).

¶39(d)(i) expressly requires training for all new hires during employee orientation. Dial complies by having its Human Resources Manager review the No Harassment or Retaliation Policy with new hires during the orientation process. The same section also requires that when Dial reassigns employees from another facility to the Montgomery plant, it provide sexual harassment prevention training to those employees before moving them to the plant. Dial has now given its on-line training courses at all its facilities, so employees henceforth transferred to the Montgomery plant will have almost certainly had this training, as the Decree requires. There have been no transfers during the life of the Decree of employees from other plants to the Montgomery plant. We recommend that henceforth Dial give the appropriate on-line course to new hires and employees transferred to the Montgomery plant who have not taken that course before.

The Decree requires that Dial provide training to all persons at the plant charged with the

handling of sexual harassment and retaliation, to be given by "experienced sexual harassment educators and/or investigators." Seyfarth Shaw At Work provided such training on October 29, 2003 for Dial's Human Resources and Employee Relations managers. The training incorporated the EEOC's 1999 Guidance On Workplace Investigations and focused on enhancing, as well as further developing, successful investigation skills.

## II. THE CURRENT CLIMATE IN THE PLANT WITH RESPECT TO CONTROL OF SEXUAL HARASSMENT

The Decree requires our report to assess "the effectiveness of Dial's policies and practices for the achievement of Dial's Statement of Intolerance of Sexual Harassment."

All evidence available to us shows that sexual harassment and related retaliation are not significant problems at the plant at the present time, and that if incidents do occur and are brought to management's attention, they will be dealt with promptly and appropriately.

There has been only a single complaint of sexual harassment made by an employee in the past year through Dial's internal procedure, and no complaints have been made to any outside agency during that period. The single complaint, discussed earlier in this report, resulted in an immediate and prompt investigation and the discharge of the accused employee.

The very low incidence of complaints would be meaningless if employees were refusing to report misconduct, but we are confident that this is not the case. Our employee interviews confirmed in various independent ways that the incidence of sexual harassment in the plant is very low.

1. We asked employees whether they believed sexual harassment was a serious problem in the plant at the present time. Only a single employee out of the 75 we interviewed

answered this question "yes," and that employee's responses to other questions suggests a belief that the situation in the plant has significantly improved over the years for women.

To test the candor of responses to this question, we asked employees if they thought sexual harassment had been a problem in the plant in the past. Although some employees, including women, denied that sexual harassment had ever been a significant problem, a majority, both women and men, told us they did believe that sexual harassment had been a significant problem in the plant in the past. We do not wish these responses to be misconstrued. We did not specify what time period we meant by "the past." Some of the employees who answered this question have worked at Dial upwards of thirty years, others have worked there only a few years, and still others for various periods in between. Thus, the fact that some employees believe that at some past time sexual harassment was a problem in the plant does not mean, to us as monitors, that it was or was not a problem as of the time the EEOC filed its lawsuit or thereafter, and does not reflect on the adequacy or inadequacy of measures Dial took prior to the entry of the Decree to control sexual harassment. It is not our function to make findings on whether there was in fact sexual harassment in the plant in the past or its extent; one reason the litigation was settled was to avoid having a judicial determination of that question. To us, the significance of these responses from employees is for the present. If employees tell us they believe sexual harassment to have been a significant problem in the plant in the past, but that it is not a significant problem today, we have considerable reason to have confidence in the sincerity of their responses. The fact that employees do not presently perceive a significant problem should therefore be a source of satisfaction to both Dial and the EEOC.

2.     We asked employees whether they had personally experienced sexual harassment

since the settlement of the litigation. Not a single employee answered this question yes. By contrast, slightly over half the women interviewed claimed to have experienced sexual harassment at some point prior to the settlement. (Their employment often goes back several decades, so no implication can be drawn from this statistic about the overall situation at any given time in the past.)

3. We asked employees not only about their own experience but also whether they had seen any other employees being sexually harassed since the settlement took effect. No women answered this question "yes."

4. We asked if there had been any change in the environment for women in the plant in recent years. A substantial majority of both men and women answered yes. Two factors were frequently mentioned by employees who cited improvement in the working environment for women at the plant. First, a significant number attributed the improvement to the litigation, even though employees had varying opinions about the validity of the claims made in the litigation. Second, many employees made clear their view that persons who are found to have engaged in sexual harassment can expect to be fired. When responding to our questions about their knowledge of and opinions about Dial's anti-harassment policy, employees repeatedly brought up the case referred to earlier in this report, in which an employee accused of sexual harassment was terminated after an investigation found merit to the charges. Such discharges are often unpopular (some of the employees we interviewed were critical of this discharge even though they admitted to having no knowledge of what had happened), but they underscore the fact that management is serious about preventing sexual harassment.

The generally favorable views employees expressed about the current control of sexual

15

harassment at the plant should not be cause for complacency. A number of women commented to us that there are men who still "push the envelope" in terms of objectionable comments and sexual innuendo, even after the litigation and even after the sexual harassment prevention training. Many women said that they would be reluctant to report such low-level misconduct and would do so only if they could not take care of the matter themselves or if the misconduct was severe. They know there is a likelihood of a strong response from management toward the offending employee, and some of them believe they could experience retaliation in the form of hostility from coworkers if the fact of their making a complaint were to become known. In our experience, such attitudes are a byproduct of any successful management program for the control of sexual harassment, particularly in a factory environment, because the more severely management punishes sexual harassers, the more reluctant some employees are to report it.

The best way to deal with this inevitable dilemma is to assure that first-line supervisors are alert to the way men and women deal with each other on the factory floor, and to detect and put a stop to problems involving disrespectful speech or other conduct that may violate Dial's policy before those problems develop into possible claims of sexual harassment. In this respect, it is encouraging that most employees we interviewed told us that they believed their own supervisors were effective in administering Dial's No Harassment or Retaliation policy.

One issue companies must face is what policy to adopt toward dating or romantic relationships between supervisors and persons within their line of supervision. We received reports in employee interviews asserting that such relationships do occur in the plant. Different companies have different policies on this issue, and some have no policy at all, or keep their policies informal. Dial informed us that it does not permit these relationships and that it takes

16

corrective steps when it learns that supervisors are dating subordinates or are romantically involved with subordinates. Since that is Dial's express policy, we recommend to Dial that it take, within 30 days, whatever concrete steps it deems necessary to disseminate and reinforce to its supervisors the existence and importance of this policy, and that it inform us of the actions taken.

                                                                            */s/ George F. Galland, Jr.*
                                                                            GEORGE F. GALLAND, JR.

                                                                            */s/ Reginald E. Jones*
                                                                            REGINALD E. JONES

                                                                            *s/ Nancy B. Kreiter*
                                                                            NANCY B. KREITER

May 24, 2004

## CERTIFICATE OF SERVICE

The undersigned, under penalty of perjury, certifies that on May 26, 2004, a copy of the foregoing **ONE-YEAR REPORT OF THE CONSENT DECREE MONITORS TO THE PARTIES AND TO THE COURT** was served on the above attorneys by messenger.

*[signature]*