IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. | ) ) ) | |
| Plaintiff, | ) ) | No.    99 C 3356 |
| vs. | ) ) | Judge Warren K. Urbom |
| THE DIAL CORPORATION, | ) ) | |
| Defendant. | ) | |

**FINAL REPORT OF THE CONSENT DECREE
MONITORS TO THE PARTIES AND THE COURT**

## FINAL REPORT OF THE CONSENT DECREE
## MONITORS TO THE PARTIES AND THE COURT

George F. Galland, Jr.
Reginald E. Jones
Nancy B. Kreiter

We were appointed as Decree Monitors pursuant to the Consent Decree agreed to between the Equal Employment Opportunity Commission and Dial Corporation in case no. 99-C 3356 in the United States District Court for the Northern District of Illinois. This lawsuit alleged a pattern and practice of sexual harassment of employees at Dial's plant in Montgomery, Illinois, near Aurora.

Paragraph 44 of the Decree provides:

> Within two (2) months after the appointment of the Decree Monitors, they will: (i) evaluate all existing employment policies, procedures, and practices that are related to the objectives contained in the Statement of Intolerance of Sexual Harassment and this Decree; and (ii) after consultation with EEOC and Dial, make recommendations for any changes to such existing policies, procedures and practices that the Decree Monitors believe is necessary or appropriate. The Decree Monitors shall report their findings and recommendations to EEOC and Dial.

On August 29, 2003, after obtaining a one-month extension, we issued to Dial and to the EEOC the Two Month Report required by paragraph 44.

Paragraph 47 of the Decree provides:

> Within one (1) year after appointment, the Decree Monitors shall complete their own review and evaluation of all current employment policies and practices, and shall submit a written report to EEOC, Dial and the Court setting forth the following information:
>
> (i) an assessment of whether Dial has successfully implemented each specific policy/practice agreed upon in paragraph 39 above;
>
> (ii) for each specific policy/practice that has not been successfully implemented, a statement discussing the reason for Dial's failure to implement such change;
>
> (iii) an evaluation of the impact of the specific changes made pursuant to this Decree;

    (iv)    an assessment of the effectiveness of Dial's policies and practices for the achievement of Dial's Statement of Intolerance of Sexual Harassment;

    (v)    recommendations for any changes to existing practices, policies or programs or any additional policies, practices or programs that the Decree Monitors deem necessary or appropriate for achieving Dial's Statement of Intolerance of Sexual Harassment and the terms of this Decree; and

    (vi)    timetables for implementation and completion of compliance with any of the recommendations, subject to the terms of this Decree.

We issued the One Year Report required by this paragraph on May 26, 2004. We found Dial in compliance with all significant obligations under the Consent Decree. We found that "All evidence available to us shows that sexual harassment and related retaliation are not significant problems at the plant at the present time, and that if incidents do occur and are brought to management's attention, they will be dealt with promptly and appropriately." We made certain recommendations for further improvements.

Paragraph 47 of the Decree, after the provisions quoted above, provides that "At the end of the second year and then again at the end of the duration of this Consent Decree, the Decree Monitors shall submit a report to EEOC, Dial and the Court setting forth the same information described herein." We issued the Second Year Report on May 20, 2005. We again found that Dial was in compliance with all aspects of the Decree and that "there has been no evidence over the past year of any significant sexual harassment problem in the plant."

The present report will be our final report before the Decree expires by its terms at the end of October 2005. To prepare this report, we reviewed the entire record of Dial's actions under the Decree from its inception; visited the plant again on August 30, 2005, where we interviewed over 40 employees chosen by random selection; reviewed new training materials prepared by an outside vendor for purposes of conducting "refresher" training on Dial's No Harassment or Retaliation Policy and annual supervisory training; and sought and obtained from Dial certain supplemental information. As a result of our activities, we believe we have a detailed and accurate perception of how Dial's written policies actually function in practice, what the situation

3

is on the plant floor with respect to control of sexual harassment, and how employees themselves perceive Dial's policies in this area.

As discussed in this report, we conclude that Dial has complied throughout the two and a half years of this Decree with the specific obligations imposed on it, and that episodes of sexual harassment continue to be rare in the plant and are dealt with appropriately when brought to management's attention. The recommendations we have made during the duration of this Decree have been small both in number and in scope, and Dial has adopted them. Continuation of its present policies once the Decree expires should keep Dial in a good position to avoid problems of sexual harassment in the future.

## I. CUMULATIVE REVIEW OF DIAL'S ACTIONS TO COMPLY WITH OBLIGATIONS FROM PARAGRAPH 39 OF THE DECREE

### A. Distribution of the Settlement Fund

The Decree assigned the Monitors no role in the processing of claims against the Settlement Fund. However, our experience suggested to us that claims processes of this nature have the potential of creating problems on the plant floor arising from resentment of those who received settlement payments. Our interviews of employees led us to conclude that at Dial the process went smoothly and that there was no evidence that participants in the claims process suffered any form of retaliation for doing so.

### B. Revision to Sexual Harassment Policy

The No Harassment Policy that existed as of the date of the Consent Decree was a brief document that applied to not only sexual harassment but all forms of EEO-related harassment covered by federal, state, or local law. Paragraph 39(a) of the Consent Decree required Dial to:

> revise its No Harassment Policy, as necessary, in order to: (i) provide examples to supplement the definitions of sexual harassment; (ii) include strong non-retaliation language with examples to supplement the definition of retaliation, and provide for

4

> substantial and progressive discipline for incidents of retaliation; (iii) provide that complaints of sexual harassment and/or retaliation will be accepted by Dial in writing and orally; (iv) provide a timetable for reporting sexual harassment and retaliation, for commencing an investigation after a complaint has been made or received and for remedial action, if any, to be taken upon conclusion of an investigation; and (v) indicate that, promptly upon the conclusion of its investigation of a complaint, Dial will communicate to the complaining party the results of the investigation and the remedial actions taken or proposed, if any, so long as the complainant agrees to keep any disciplinary action taken confidential.

Pursuant to this provision, Dial submitted to the Monitors a proposed revision of its policy. The Monitors suggested certain changes and additions, and agreement was reached on a final version which complies fully with ¶39. In our initial report we recommended that Dial immediately distribute the revised policy to all employees in the plant, with a written request to read it and return, within a short number of days to be determined by Dial, a written acknowledgment that they have received and read it, and post the policy in the plant in place of the superseded policy. Dial implemented this recommendation.

### C. Complaint Procedures

As required by ¶39(b)(i), the revised Policy designated two Human Resources Department officials and their telephone numbers as persons who can be contacted. Dial has kept this section of the Policy updated when the relevant officials changed.

As also required by ¶39(b)(i), Dial has kept its 24 Hour Complaint Hotline in place. We reviewed the written and on-line materials which are available to employees and the manner in which employees could use the system to make a complaint. We also interviewed the responsible individuals within Dial Corporation charged with oversight of the 24-hour hot line system, including the assistant corporate secretary. The Hotline is a system for receiving complaints from employees throughout the Dial organization. The system is not limited to complaints of sexual harassment. Complaints can be made by the toll free telephone number (the number is prominently posted on a banner in the plant, and in the printed No Harassment/ Retaliation Policy), or by filing a complaint online. Dial uses an outside contractor (Ethics Point) to receive

5

such complaints and transmit them to Dial. In practice, this Hotline has been used by employees across the corporation but has rarely, if ever, been used to report a complaint of sexual harassment. Of the five internal complaints of sexual harassment or related retaliation that were received by Dial from the Montgomery plant while the Decree has been in effect, only one was received through the Hotline.

In the course of reviewing the on-line method of reporting a complaint, the Monitors noticed that employees were required to sign a waiver and disclaimer before filing an on-line complaint. This led us to ask whether such a practice could act as a disincentive to an employee actually making a complaint, and in turn to ask about Dial's methods to assure confidentiality of complaints made to the Hotline. Dial officials satisfied us that safeguards are in place to protect confidentiality of any employee who chooses to complain through the Hotline, whether by phone or on-line. We asked a number of employees about the Hotline in our interviews and found no evidence of any distrust of this mechanism.

¶39(b)(ii) required Dial to assure that complainants will be interviewed about their complaints in such a manner that permits the complaining party, at her or his election, to provide information in a confidential manner. To this end, the revised Policy explicitly guarantees complainants and witnesses "the opportunity to provide information in a confidential manner, such as providing the information outside of their work area."

¶39(b)(iii) imposed a best-efforts requirement of three weeks to complete investigations of complaints of sexual harassment and retaliation, with another seven days to prepare findings of the result of the investigation and remedial action proposed. During the two and a half years of this Decree, there have been five such investigations. Dial met this three-week time limit for all of them.

¶39(b)(iv) required Dial to allow complainants who are dissatisfied with the disposition of a complaint the opportunity to appeal to the "Complaint Monitor." On two of the five complaints filed during the life of the Decree, Dial failed to inform the complainants of this opportunity. The Complaint Monitor found out through other means of these failures, investigated them, and

6

concluded they were inadvertent mistakes. They represent the only occasions during the course of this Decree in which Dial overlooked the requirements of any specific provision of the Decree.

Aside from verifying compliance with these specific obligations, during our employee interviews, we looked for any evidence that the present complaint procedure for sexual harassment at the plant deters employees from making complaints if they are experiencing sexual harassment, and found no substantial evidence of such deterrence. We asked employees whether, if they were experiencing sexual harassment, they would report it. In the first set of interviews conducted in early 2004, 58.8% flatly answered yes; another 35.3% said they would report harassment if they couldn't take care of it themselves or if it was severe enough; only 5.9% said they would not report it, and only two such persons gave distrust of management as their reason. In the interviews of August 2005, the responses were essentially the same. As we said in our One Year Report, in a unionized factory which has been the scene of recent sexual harassment litigation, this seems to us to represent an encouragingly low incidence of negative responses to this question. Employees tended to say that they would report problems in the first instance to their immediate supervisor rather than to Human Resources.

### D. Policies to Promote Supervisor Accountability

Decree ¶39(c)(i) provided:

> Dial agrees that it shall impose discipline – up to and including termination, suspension without pay, or demotion – upon any supervisor or manager who engages in sexual harassment or tolerates any such conduct in his or her work area or among employees under his or her supervision, or who retaliates against any person who complains or participates in any investigation or proceeding concerning any such conduct. Dial shall communicate this policy to all of its supervisors and managers.

During the life of the Decree, one accusation of retaliation related to an earlier sexual harassment complaint was made by a nonsupervisory employee against a supervisor. Dial investigated and found the charge without merit, a conclusion with which the Complaint Monitor concurred.

7

Section 39(c)(ii) required Dial to continue to advise all managers and supervisors of their duty to monitor their work areas to ensure employees' compliance with the No Harassment or Retaliation Policy, and to report any incidents and/or complaints of sexual harassment and/or retaliation of which they become aware. In our First Year Report, we recommended

> that Human Resources provide ongoing guidance to supervisors to conduct activities in team meetings, at least on a quarterly basis beginning no later than July 1, 2004, that promote awareness of the No Harassment or Retaliation policy and to conduct proactive measures to prevent sexual harassment. To prevent such activities from turning into a rote or perfunctory exercise that never varies in content, Human Resources should become involved in planning the activities that supervisors will be asked to conduct and should take steps to assure that supervisors carry out the activities as planned on a reasonable uniform plantwide basis. We request that the Human Resources Director apprise us of each quarter's guidance to supervisors and provide verification of supervisor compliance.

Dial accepted this recommendation and has complied with it, designing material (referred to as "1-2-3 Refresher") for supervisors' use in quarterly team meetings that were conducted in September and October 2004, December 2004, March 2005, and June 2005. In our Two Year Report, we again recommended that Dial vary the material used in these quarterly meetings, and Dial did so. We received favorable feedback from employees in interviews about the use of supervisors' team meetings to revisit the No Harassment or Retaliation Policy. We recommend that this process continue once the Decree ends.

In ¶39(c)(iii), Dial agreed to "use in its supervisor appraisal process, an evaluation of the supervisor's handling of equal employment opportunity ("EEO") issues, and to link such evaluations directly to supervisor salary/bonus structure." In our initial report, we recommended that Dial revise its current performance evaluation form and related materials to incorporate appropriate language to assure that the supervisor's handling of equal employment opportunity issues is specifically addressed during the appraisal process. Dial revised the form as requested. Thereafter, Dial periodically provided us with copies of specific material (with names of evaluated employees deleted) that commented in any manner on specific supervisors' performance or nonperformance in the area of EEO. Dial has seen no occasion to conduct criticism of

8

supervisors on this score in these evaluations and we have seen no episodes that we thought merited such formal criticism.

In ¶39(c)(iv), Dial agreed to use "commitment to equal employment opportunity" as a criterion for qualification for supervisory positions. The Decree does not elaborate on this requirement, which raises two issues. The first is: how is this "criterion" applied when Dial promotes someone from a nonsupervisory position into a supervisory position? The second issue is: how is this "criterion" applied when Dial promotes management or supervisory people to higher-level management or supervisory positions? In both situations, the wording of ¶39(c)(iv) seems to assume a formalized promotion process in which formal "criteria" are applied to candidates for promotion, whereas, like many employers, Dial has not formalized to that extent its promotion process for supervisory or higher-level management positions.

Whatever Dial's techniques for such promotions, ¶39(c)(iv) clearly requires taking steps to assure that persons known or suspected to have been sexual harassers do not get promoted into these positions. (This is mainly an issue for promotion of supervisors to higher-level supervisory positions, because in recent years, it has been extremely rare to promote hourly workers into a supervisory salaried position. Dial now fills most such entry-level supervisory positions by hiring persons with engineering backgrounds from outside.) The Human Resources Director participates in all promotions or hirings to management positions. She assures us that her participation is sufficient to assure that any persons who are known or suspected to have engaged in sexual harassment, or otherwise have negative experience in the area of EEO, will be flagged in the process and will not be granted the promotion. Given that the plant is not large and such promotions are rare, we see no reason to suggest any more formal process for applying the "criterion" of ¶39(c)(iv).

E.  **Sexual Harassment Training**

9

Under ¶39(d)(i), Dial must continue to provide mandatory sexual harassment prevention training annually to all supervisors at the plant, to provide training to all new employees during employee orientation, to provide training to all "senior management officials," and to all Dial employees who are to be assigned to work at the plant, before their assignment begins.

As we noted in our First Year Report, Dial went beyond the requirements of this paragraph. In particular, the Decree does not specifically require sexual harassment prevention training of all nonsupervisory workers at the plant, but in the first year of the Decree Dial conducted such training through an on-line sexual harassment prevention training course developed by Seyfarth Shaw At Work. We reviewed this course, as well as another on-line course developed to satisfy the Decree's requirement of annual sexual harassment prevention training for supervisors. We found both on-line courses well done. We suggested certain minor changes which Dial made wherever they could be adapted within the particular training product.

In our One Year Report, we recommended that the company immediately follow up to assure that on-line training is given to employees who for one reason or another, such as absence or technological barriers, missed the first round, since we became aware through interviews of people who did miss the training for such reasons. Dial complied with this recommendation and notified us of the results.

Our One Year Report also recommended that Dial design a refresher version of sexual harassment prevention training to be given every one to two years. Dial agreed with this recommendation and specifically has agreed to provide refresher training for nonsupervisory employees in the fall of 2005. In both the One Year Report and Second Year Report, we recommended that strong consideration be given to including live discussion in the next version of that training. Dial did give consideration to this request but ultimately decided to purchase a "refresher" on-line course designed by the same vendor who designed the on-line basic course. Given the extremely low incidence of any allegations of sexual harassment at the plant at the present time, we accepted this decision. On-line training is now part of Dial's "culture." Although

our employee interviews produced much support for a "refresher" course, there was no clear consensus that live training would be more valuable than on-line training.

We reviewed an early "draft" version of the refresher on-line training course. It had not yet been customized for Dial Corporation but will be customized. In general we found the product adequate but not as well designed as the "complete" version of the on-line courses. We made suggestions to improve it. Dial passed on these suggestions to the vendor. Some proved technically feasible at an acceptable cost and will be made, while others did not. Dial informs us that the refresher on-line course will be given shortly after the Decree expires.

Decree ¶39(d)(i) expressly requires training for all new hires during employee orientation. In connection with this obligation, our One Year Report noted that "Dial complies by having its Human Resources Manager review the No Harassment or Retaliation Policy with new hires during the orientation process," and recommended that "henceforth Dial give the appropriate on-line course to new hires and employees transferred to the Montgomery plant who have not taken that course before." Dial complied with this recommendation.

The same section also required that where Dial reassigns employees from another facility to the Montgomery plant, it provide sexual harassment training to those employees before moving them to the plant. Dial can comply with the letter of this obligation merely by following its existing practice of including training in sexual harassment during new employee orientation for all employees at all facilities. But in any case, there has been training for employees transferred into the plant from elsewhere during the period of the Decree.

Decree ¶39(d)(i) expressly requires mandatory sexual harassment prevention training annually for all supervisors at the plant. In fall 2004 Dial complied with this requirement by repeating the on-line course for supervisors, and as discussed above it is developing a new on-line course for this purpose in 2005. In the Second Year Report we recommended that strong consideration be given to including live discussion in the next version of supervisory training, but Dial decided to stay with the on-line format, for reasons similar to those discussed above in connection with "refresher" training.

11

The Decree also required that Dial provide training to all persons at the plant charged with the handling of sexual harassment and retaliation, to be given by "experienced sexual harassment educators and/or investigators." Seyfarth Shaw At Work provided such training on October 29, 2003 for Dial's Human Resources and Employee Relations managers, including from the Montgomery Plant.

### F.     Miscellaneous

In our First Year Report we commented on Dial's internal policy discouraging romantic relationships between supervisors and subordinates and recommended that Dial take, within 30 days, whatever concrete steps it deemed necessary to disseminate and reinforce to its supervisors the existence and importance of this policy, and to inform us of the actions taken. In response, Dial told supervisors at a July 2004 supervisor meeting that it had a policy against dating among supervisors and subordinates when there is a direct reporting relationship between the two individuals. It instructed supervisors that if they find themselves in this situation, s/he must advise Human Resources, and that Dial would then manage the situation on a case by case basis in a way that minimizes the effect on employee morale and productivity from both the standpoint of coworkers and the two employees involved in the relationship.

Despite stating this policy orally to supervisors, however, Dial did not put this policy into writing. In our employee interviews in August 2005, we encountered employees who said that that dating between supervisors and subordinates continued to occur in the plant and who were not aware of Dial's anti-dating policy. We discussed this matter with Dial. Dial then formulated a simple and clear written statement of its policy and informed us that it intends to distribute that policy to its supervisors. We concur with this plan and also recommend that the policy be distributed to all employees in the plant and covered in training and "1-2-3 Refresher" materials.

## II. THE CURRENT CLIMATE IN THE PLANT WITH RESPECT TO CONTROL OF SEXUAL HARASSMENT

The Decree requires this Final Report, like earlier reports, to assess "the effectiveness of Dial's policies and practices for the achievement of Dial's Statement of Intolerance of Sexual Harassment."

As with earlier reports, all evidence available to us shows that sexual harassment and related retaliation are not significant problems at the plant at the present time, and that if incidents do occur and are brought to management's attention, they will be dealt with promptly and appropriately.

First, the incidence even of *complaints* about sexual harassment or related retaliation has been remarkably low throughout the Decree. In thirty months there have been only five such complaints to management by employees – an average of one every six months. Of these five complaints, management concluded in three cases that there had been a violation of the No Harassment or Retaliation Policy and imposed discipline, including discharge in two cases. In the remaining two, management did not impose discipline, finding the complaint without merit in one case and in another case finding that witnesses identified by the complainant did not support the complainant's account. In all cases, in our view, management reacted appropriately to the situations that were brought to its attention.

Second, there have been no complaints of sexual harassment or related retaliation to agencies outside of Dial throughout the life of the Decree.

Third, both sets of employee interviews (February 2004 and August 2005) confirmed that employees do not believe that sexual harassment is common at the plant. The results of the latest interviews include the following:

1. We asked employees whether they believed sexual harassment was a serious problem in the plant at the present time. The overwhelming majority of employees expressed strong opinions to the effect that the plant today is free of sexual harassment and that it is now punished severely by management when it comes to management's attention.

13

2. We asked employees if they had experienced sexual harassment themselves since the settlement. Three out of the 42 employees who answered this question answered "yes." Two of those employees brought the matter to management's attention, and in our view, management reacted quickly and appropriately to the matter. The third did not report the matter in question.

3. We asked employees not only about their own experience but also whether they had seen any other employees being sexually harassed since the settlement took effect. Three out of the 43 employees who answered this question said "yes." One of these, however, reported an incident that took place several years before the settlement. In the other two cases, the matter was reported to management, with resulting action referred to above.

4. We asked if there had been any change in the environment for women in the plant over the last two or three years. A majority of both genders answered yes, and every such respondent said the change had been for the better. As with the answers to this question in our 2004 interviews, persons who perceived an improvement in the plant in recent years tended to attribute the improvement to the litigation (even though employees continued to have varying opinions about how valid the claims made in the litigation were) and to a clear policy with strict consequences for its violation. Employees in these latest interviews commented extensively on their belief that persons who are found to have engaged in sexual harassment can expect to be fired.

As we commented in earlier reports, the generally favorable views employees expressed about the current control of sexual harassment at the plant should not be cause for complacency. The latest interviews continued to produce occasional comments about men who make objectionable comments and sexual innuendo, even after the litigation and even after the sexual harassment prevention training. Many women said that they would be reluctant to report such low-level misconduct and would do so only if they could not take care of the matter themselves or if the misconduct was severe.

We therefore repeat our earlier comment that the best way to deal with this inevitable dilemma is to assure that first-line supervisors are alert to the way men and women deal with each

14

other on the factory floor, and to detect and put a stop to problems involving disrespectful speech or other conduct that may violate Dial's policy before those problems develop into possible claims of sexual harassment. There is a certain degree of violation of Dial's No Harassment and Retaliation policy at which it is unrealistic to expect that employees will report the matter to Human Resources or anywhere else and thereby put the offender at risk of being fired. Such conduct can be seriously offensive to employees at whom it is directed even though they are reluctant to report it, and if it becomes habitual it can lead to more serious problems for employees and the company. Our experience is that in the absence of appropriate vigilance by first line supervisors, and in the absence of appropriate punishment of sexual harassment when reported, there is always a significant danger in any factory environment for sexually harassing behavior to become unacceptably common. It is therefore important for supervisors to be vigilant.

As with earlier interviews, most employees we interviewed told us that they believed their own supervisors were effective in administering Dial's No Harassment/Retaliation policy. If this continues to be the case, and if Dial continues to deal with appropriate severity with those episodes that are reported and where violations are found, the current satisfactory state of affairs with respect to the control of sexual harassment can be expected to continue.

/s/ George F. Galland, Jr.
GEORGE F. GALLAND, JR.


/s/ Reginald E. Jones
REGINALD E. JONES


/s/ Nancy B. Kreiter
NANCY B. KREITER

October 26, 2005

## CERTIFICATE OF SERVICE

    The undersigned, under penalty of perjury, certifies that on October 26, 2005, a copy of the foregoing FINAL REPORT OF THE CONSENT DECREE MONITORS TO THE PARTIES AND TO THE COURT was served on all attorneys of record electronically pursuant to ECFS.

                                                         /s/ George F. Galland, Jr.